UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| ADMIRAL WEBSTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:06-cv-327 |
| | ) (Guyton) |
| JTEKT AUTOMOTIVE TENNESSEE - | ) |
| VONORE, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 12]. This matter is before the undersigned on the defendant's motion for summary judgment [Doc. 15].

**I.      Introduction**

This is a race discrimination action brought by the plaintiff Admiral Webster against his former employer, JTEKT Automotive Tennessee-Vonore ("JTEKT").[1] Specifically, the plaintiff asserts causes of action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et*

---

[1]During the plaintiff's employment, and for a time afterwards, JTEKT was known as Koyo Steering Systems; therefore, the employment policies at issue and some of the other documents in the record refer to "Koyo" as the plaintiff's employer. [Knight Aff. at ¶3].

*seq.* ("THRA"), alleging that the defendant wrongfully terminated him and failed to rehire him because of his race. [Doc. 1].

It is admitted that JTEKT is an "employer" within the meaning of Title VII and the THRA, and further, that the EEOC issued the plaintiff a Notice of Right to Sue on March 31, 2006. [Doc. 5]. The subject matter jurisdiction of this Court is not in dispute. [Id.].

After carefully considering the entire record, the Court concludes that summary judgment in favor of JTEKT is not appropriate as to the plaintiff's claims. Accordingly, for the reasons set forth herein, the defendant's Motion for Summary Judgment [Doc. 15] is **DENIED**.

## II. Facts

As required by Rule 56 of the Federal Rules of Civil Procedure, the Court will recite and consider the relevant facts in the light most favorable to the plaintiff. In doing so, the Court relies on the deposition of the plaintiff Admiral Webster and the affidavits of several JTEKT employees, and other testimony and exhibits filed with the Court.

### A. Plaintiff's Termination

The defendant JTEKT manufactures steering systems for auto makers at its plant in Vonore, Tennessee. [Knight Aff. at ¶4]. The defendant hired the plaintiff as a Production Technician in January, 2001. [Webster Dep. at 26]. The plaintiff was one of a group of ten people who were hired by the defendant in January, 2001, and he was the only African-American in the group. [Webster Aff. at ¶3]. Initially, the plaintiff worked on Line 5, making steering gears. After about four years, he transferred to Line 8, where he made a different type of steering gear. [Webster Dep. at 26-27]. The plaintiff testified that his performance as an employee was "excellent." He

received a safety award in 2004 and was a safety coordinator for his line. [Complaint at ¶¶12-13; Webster Dep. at 91].

Effective May 1, 2004, the defendant revised its Substance Abuse Policy. [Knight Aff. at ¶5]. The revised policy provided, among other things, that the defendant would conduct random, unannounced testing, and that employees who tested positive for drug use would be discharged from employment. [Knight Aff., Ex. A]. Before the revised policy took effect, Human Resources Supervisor Terry Knight ("Knight") conducted meetings for employee groups to explain the changes in the policy. [Knight Aff. at ¶5]. He also provided each employee with an Acknowledgment and Consent Form to be signed. [Id.]. The plaintiff received and signed the Acknowledgment and Consent Form on March 4, 2004. [Webster Dep. at 109-10, Ex. 8]. By signing this form, the plaintiff acknowledged that he was "subject to drug and alcohol testing at any time" during his employment with the defendant, and he affirmed that he had "read and understood the Substance Abuse Policy" of the company. [Id., Ex. 8].

The defendant routinely conducts random drug testing. [Knight Aff. at ¶8]. The defendant uses a hair test method for drug testing, which is performed by a company called Psychemedics. [Id. at ¶7]. Each quarter, the defendant sends an updated employee list to Concentra Health Services. [Howard Aff. at ¶3]. Concentra utilizes a computerized random selection program to select twenty-five employees from the list, and sends the list of names to the defendant's nurse, LeAnne Howard ("Howard"). [Id.]. From the list of twenty-five employees, Howard selects about eight employees per month for testing. [Id. at ¶4]. Pursuant to its random selection process, the defendant selected the plaintiff for drug testing in August, 2005. [Id. at ¶5]. Howard scheduled the

3

plaintiff's test for August 3, 2005, and Webster acknowledged notice of his selection on that date. [Webster Dep., Ex. 2].

Pam Nichols ("Nichols") worked as a nurse for the defendant and served as a collector when employees were selected for drug screens. [Nichols Aff. at ¶¶2, 3]. She described the procedure that she followed when collecting hair samples for drug screens as follows:

> I obtained a sample of hair, typically from the scalp or underarm, by cutting the hair myself. I then placed the hair in a piece of tin foil that was provided by the testing company, Psychemedics. I did this in the presence of the employee. Then, I folded the tin foil in half and placed it in the SAC (sample acquisition card), placed integrity tape on it, and signed and dated the integrity tape. I wrote the employee's social security number, and date and time of collection on the SAC, then signed the SAC. The employee then initialed the SAC, verifying that it contained the employee's sample. I then placed the sealed SAC in a bio-hazard bag, and sealed the bag with self-adhesive tape. The employee then initialed and dated the sealed bag. The employee was present and witnessed this entire collection process. The signed and sealed bag was then shipped to Psychemedics, via an overnight carrier service.

[Nichols Aff. at ¶4]. Nichols followed this procedure when collecting the hair sample from the plaintiff in August, 2005. [Id. at ¶5]. The plaintiff confirmed in his deposition that Nichols clipped hair from his underarm for the hair sample, placed the hair in a piece of aluminum foil, and placed the foil in a container. [Webster Dep. at 75]. He did not see Nichols seal that container. He does, however, recall initialing the container that contained the aluminum foil with the hair sample. [Id. at 76-77]. On the Psychemedics Forensic Drug Test Custody and Control Form ("Control Form"), the plaintiff signed a section entitled "Donor Certification," which states, in pertinent part, as follows:

> [I] certify that I am the test subject, that the sample contained in the envelope is my sample, that it was cut close to the skin, and I witnessed the sample collector seal the sample in the envelope. I

4

> consent to the testing of the sample by Psychemedics Corporation and to the release of the results to the named test result recipient . . . .

[Webster Dep., Ex. 3]. The plaintiff's test results came back positive for cocaine. [Gilbert Aff., Ex. A].

In the event of a positive test, the Medical Review Officer ("MRO"), Dr. Eleanor Gilbert, interviews the employee personally, asking a variety of questions designed to determine whether there is some legitimate medical reason for the positive result. [Gilbert Aff. at ¶4]. If Dr. Gilbert determines that no legitimate reason exists, she then sends the MRO Report to the defendant, verifying the positive result. If she determines that a legitimate explanation does exist, there are a variety of additional steps that she can take before determining whether the result should be reported as a verified positive. [Id.].

Dr. Gilbert followed her normal protocol before submitting the MRO Report regarding the plaintiff to the defendant. [Gilbert Aff. at ¶5]. Dr. Gilbert contacted the plaintiff by telephone on August 8, 2005. [Webster Dep. at 77]. In his interview with Dr. Gilbert, the plaintiff did not provide Dr. Gilbert with any information that would indicate to her that a false positive may have occurred. [Gilbert Aff. at ¶5]. Thereafter, Dr. Gilbert submitted to the defendant the MRO Report indicating that the plaintiff had tested positive for cocaine. [Gilbert Aff., Ex. A]. After receiving the report, Knight informed the plaintiff that he was being discharged pursuant to company policy. [Webster Dep. at 79].

**B. Failure to Rehire**

The plaintiff immediately went to his family doctor and had an independent drug test performed. The plaintiff's family doctor tested his urine and took another hair sample. Both tests

conducted by the plaintiff's family doctor came back negative and indicated no presence of cocaine or other drugs in his system. [Webster Aff. at ¶6]. The plaintiff showed the negative test results to Knight. Additionally, the plaintiff noted that the Control Form stated an incorrect date of collection, as it indicated August 1, 2005, instead of August 3, 2005. [Webster Dep. at 87-89]. Knight responded, in essence, that the defendant stood by the results of the positive result from the Psychemedics hair test:

> Q     Did you talk to anyone about the possibility of being rehired?
>
> \*     \*     \*
>
> A     The only time I ever talked to anybody in management position was when I came and talked to Mr. Knight. And basically, I was just, at that time, trying to get my opportunity at proving my innocence before the Company, without legally going through and doing it. Okay?
>
> And I can't say in the exact words, but I was just basically told until I prove that test wrong I couldn't be rehired – or whatever. I couldn't be rehired or get my job back. They were going to stand by the test is what they're doing.

[Id. at 87-88].

Knight states in his affidavit that there was no specific discussion about rehiring the plaintiff, due to the positive drug screen. [Knight Aff. at ¶13]. Knight did contact Dr. Gilbert about the incorrect collection date on the hair sample. [Knight Aff. at ¶11]. Dr. Gilbert ultimately decided that the incorrect date of collection resulted from a clerical error that did not affect the validity of the test result. Dr. Gilbert made that determination after receiving a "Memorandum for the Record" from Nichols, which explained that Nichols had made a clerical error by writing the wrong date on the form. After receipt of this Memorandum from Nichols, Dr. Gilbert issued an amended MRO Report, again verifying the positive result. [Gilbert Aff. at ¶¶6-8, Ex. C). The defendant relied on

this amended MRO Report in deciding to maintain the earlier discharge action. [Knight Aff. at ¶12].

The defendant replaced the plaintiff with a current employee, pursuant to a seniority-based selection policy, which the plaintiff agrees was in place before his discharge. [Webster Dep. at 119-20]. Under that policy, employees on "off shifts" can place their names on a list of persons interested in moving to first shift. [Knight Aff. at ¶15]. When an opening on first shift occurs, the most senior, qualified employee on the list is given the opportunity to take the position. [Id.]. If that employee declines, the opportunity is offered to the next most senior employee, and so on until someone accepts the position. [Id.]. The defendant followed this policy after the plaintiff's discharge, resulting in the replacement of the plaintiff by a white female. [Id. at ¶ 16].

### III.     The Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing that there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inference in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Id. at 248. The genuine

issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52; see also Gaines v. Runyon, 107 F.3d 1171, 1174-75 (6th Cir. 1997) (requiring non-moving party "to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial" in order to defeat summary judgment).

**IV.** **Analysis and Ruling**

The plaintiff alleges that he was discriminated against because of his race in violation of Title VII and the THRA. Because the Tennessee Legislature intended the THRA to embody the policies set forth in the federal civil rights statutes, "an analysis of claims under the THRA is the same as under Title VII of the Federal Civil Rights Act." Lynch v. City of Jellico, 205 S.W.3d 384, 399 (Tenn. 2006), cert. denied, 127 S. Ct. 1830 (2007).

A plaintiff may establish a Title VII employment discrimination claim by either presenting direct evidence of discrimination or by introducing circumstantial evidence from which discriminatory treatment may be inferred. See Johnson v. Kroger Co., 319 F.3d 858, 864 (6th Cir. 2003). In the present case, the plaintiff does not claim to have any direct evidence of discrimination. Accordingly, the Court must determine whether the plaintiff has presented sufficient circumstantial evidence under the McDonnell-Douglas burden-shifting framework to make out a prima facie case of discrimination.

Under the McDonnell-Douglas framework, the plaintiff in an employment discrimination case has the initial burden of showing that: "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006) (quoting DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004)).

To establish a failure to rehire claim, the plaintiff must show: (1) that he is a member of the protected class; (2) that he is qualified for rehire; (3) that he applied for an available position or can show that the defendant was otherwise obligated to consider him; and (4) that the position went to a person outside the protected class. See Wanger v. G.A. Gray Co., 872 F.2d 142, 145 (6th Cir. 1989) (age discrimination).

Once the plaintiff has made out a prima facie case, the burden of production shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for the adverse employment action. Wright, 455 F.3d at 706. If the defendant satisfies this burden, the plaintiff must then show that the defendant's "legitimate, non-discriminatory reason" is merely "pretext for discrimination."

9

Id. at 706-07 (quoting DiCarlo, 358 F.3d at 414-15). Throughout the burden-shifting analysis, the ultimate burden of persuasion remains with the plaintiff. Wright, 455 F.3d at 707.

The defendant argues that the plaintiff cannot establish a prima facie case for either claim. With respect to the plaintiff's claim of discriminatory discharge, the defendant argues that the plaintiff cannot satisfy the fourth element of the prima facie case. In so arguing, the defendant urges the Court to require the plaintiff to prove that he was treated differently than a similar-situated person outside of the protected class. The defendant argues that, under the circumstances of this case, 42 U.S.C.§ 2000e-2(h) prohibits the plaintiff from establishing the fourth element of the prima facie case by showing that the defendant replaced him with someone outside of the protected class.

Section 2000e-2(h) provides, in pertinent part, that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . . provided that such differences are not the result of an intention to discriminate because of race" or another protected category. The defendant argues that because it lawfully replaced the plaintiff via the operation of a "bona fide seniority system," it would be improper to use this action to prove a prima facie case of intentional discrimination. The defendant has not cited any authority, and the Court is not aware of any such authority, which limits a Title VII plaintiff to proving a prima facie case of discriminatory discharge only by showing that the plaintiff was treated differently than other similarly situated employees outside the protected class. Indeed, the Sixth Circuit has clearly held that a plaintiff may satisfy the fourth element of the prima facie case by showing either that the plaintiff was replaced by a person outside the protected class or that the plaintiff was treated differently than similarly-situated non-protected employees. See Wright, 455 F.3d at 707.

Upon review of the record, the Court finds that the plaintiff has established a prima facie case of discrimination arising from his termination. The plaintiff is African-American; he was qualified for his position; he suffered an adverse employment action, i.e., he was terminated; and he was replaced by a person outside the protected class. Further, the Court finds that the plaintiff has established a prima facie case of discrimination for failure to rehire. In addition to having established that he is a member of a protected class and being replaced by a person outside that class, the plaintiff has shown that he was available for rehire. Additionally, there is evidence that he spoke with Knight about being re-hired and was informed that he would not be re-hired unless he could prove that the drug test was wrong. The Court finds this to be sufficient evidence under the circumstances to satisfy this element of the prima facie case.

The plaintiff having made out a prima facie case for both of his claims, the burden of production shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the plaintiff's termination and for the defendant's failure to re-hire him. The Court finds that the defendant has satisfied this burden. The defendant has presented evidence that the plaintiff was terminated because he tested positive for cocaine, and further, that he was not re-hired because of that positive drug test. The defendant's Substance Abuse Policy, as revised effective May 1, 2004, clearly states that all employees are subject to random drug testing, and that those employees who test positive for drug use are to be discharged. [Knight Aff., Ex. A]. The defendant presented evidence that several employees have been terminated since 2004 under the Substance Abuse Policy, and that all were white, except for plaintiff. Accordingly, the Court finds that the defendant has proffered a legitimate, non-discriminatory reason for the plaintiff's termination and the defendant's decision not to re-hire him. See Satterwhite v. Faurecia Exhaust Systems, Inc., No. 3:02-CV-574,

2005 WL 1279253, at *11 (S.D. Ohio May 31, 2005) (finding positive drug screen to be legitimate, non-discriminatory reason for termination).

The defendant having shown a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to produce evidence from which a reasonable jury could conclude that the defendant's proffered reason is pretext for discrimination. A plaintiff may demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Johnson, 319 F.3d at 866 (quoting Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000)). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated against him.'" Johnson, 319 F.3d at 866 (quoting Braithwate v. Timken Co., 258 F.3d 488, 493 (6th Cir. 2001)).

The plaintiff concedes that the second and third methods of proving pretext listed above are not applicable in this case. He argues, however, that he has presented evidence from which a reasonable jury could conclude that the defendant's proffered reason for his termination – a positive drug screen – had no basis in fact. The defendant counters that it had "an honest" belief that the positive drug test was correct, and therefore, any evidence that might indicate that the drug test was not correct is immaterial to the "no basis in fact" analysis.

With respect to establishing pretext, the Sixth Circuit has stated as follows:

> A plaintiff can show pretext . . . by adducing evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false. Absent some substantiating evidence, a plaintiff's mere denial of the defendant's articulated legitimate reason . . . is insufficient for a race discrimination claim to withstand a motion for summary judgment. However, even where a plaintiff can

12

> establish that the employer's actions were premised on a false or incomplete set of facts, he will not necessarily succeed in showing pretext. Where the employer honestly believes in the reason given for its employment action, a plaintiff cannot demonstrate pretext simply because [the reason] is ultimately shown to be incorrect. The employer can establish "honest belief" by showing its reasonable reliance on the particularized facts that were before it at the time the decision was made. The decisional process used by the employer need not be optimal nor must it leave no stone unturned. Rather, <u>the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action</u>.

Haughton v. Orchid Automation, 206 Fed. Appx. 524, 542 (6th Cir. Nov. 20, 2006) (citations and internal quotation marks omitted) (emphasis added).

Upon carefully reviewing the evidence, the Court finds that the plaintiff has presented evidence from which a reasonable jury could conclude that the defendant's reason for terminating the plaintiff, and for refusing to rehire him, had no basis in fact, and that the defendant did not honestly believe that its proffered reason for termination, that the plaintiff, in fact, had failed a drug test, was true. Immediately upon learning of the positive drug screen, the plaintiff went to his family doctor and had two drug tests performed, both of which came back negative and indicated no presence of cocaine or any other drug in the plaintiff's system. The plaintiff showed these negative test results to Knight and also advised him of the incorrect date on the positive test result. According to the plaintiff, the defendant rejected this evidence, and the plaintiff was told that the defendant would stand by the results of the original drug test administered by Psychemedics, until the plaintiff "could prove that test wrong."

The plaintiff's evidence that his termination was the result of racial animus is circumstantial and less than compelling. Nonetheless, based upon the record, a reasonable jury could find that the plaintiff, in fact, did submit sufficient evidence to the defendant to prove that the

13

Psychemedics test was wrong, and therefore, the defendant was obligated to re-hire the plaintiff as promised. A jury could also find, at the very least, that the negative drug screens warranted further investigation into the accuracy of the Psychemedics drug screen prior to the plaintiff's termination, and that the defendant's failure to do so indicates a lack of honest belief in the proffered reason for termination. Because a jury question is presented on these matters, which go to the issue of pretext, summary judgment is inappropriate as to the plaintiff's claims.

## V.     Conclusion

For the foregoing reasons, the Court finds that there are genuine issues of material fact which preclude a grant of summary judgment in this case. Accordingly, the defendant's Motion for Summary Judgment [Doc. 15] is hereby **DENIED**.

**IT IS SO ORDERED.**

**ENTER:**

　　　s/ H. Bruce Guyton　　　
United States Magistrate Judge